1  WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Heather L. Gilliland,<br><br>        Plaintiff,<br><br>v.<br><br>Commissioner of Social Security Administration,<br><br>        Defendant. | No. CV-16-01978-PHX-GMS<br><br>**ORDER** |

Pending before the Court is Plaintiff Heather Gilliland's appeal of the Social Security Administration's decision to deny benefits. (Doc. 1.) For the reasons set forth below, the Court affirms the decision.

## BACKGROUND

On October 15, 2012, Heather Gilliland applied for disability insurance benefits, alleging a disability onset date of June 1, 2011. (Tr. 16.) Gilliland's claim was denied both initially and upon reconsideration. (*Id.*) She then appealed to an Administrative Law Judge ("ALJ"). (*Id.*) The ALJ conducted a hearing on the matter on May 21, 2014. (Tr. 41.)

In evaluating whether Gilliland was disabled, the ALJ undertook the five-step sequential evaluation for determining disability.[1] At step one, the ALJ determined that

---

[1] The five-step sequential evaluation of disability is set out in 20 C.F.R. § 404.1520 (governing disability insurance benefits) and 20 C.F.R. § 416.920 (governing supplemental security income). Under the test:

Gilliland had not engaged in substantial gainful activity since her alleged onset date. (Tr. 18.) At step two, the ALJ determined that Gilliland suffered from severe impairments of fibromyalgia, arthritis, migraine headaches, asthma, major depressive disorder, borderline personality disorder, and mood disorder. (*Id.*) At step three, the ALJ determined that none of these impairments, either alone or in combination, met or equaled any of the Social Security Administration's listed impairments. (Tr. 19–20.)

The ALJ then made the following determination of Gilliland's residual functional capacity ("RFC"):[2]

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: she can frequently climb ramps/stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, crouch, and crawl; frequently do reaching, handling, and fingering activities; must avoid concentrated exposure to extreme temperature, loud noises, vibrating environments, pulmonary irritants and hazards; and is limited to occasional interaction with coworkers and supervisors.

(Tr. 20.) The ALJ therefore found that Gilliland retained the RFC to perform her past relevant work as a medical biller. (Tr. 30.) Accordingly, the ALJ found that Gilliland was not disabled and not entitled to benefits. (Tr. 31.)

---

A claimant must be found disabled if she proves: (1) that she is not presently engaged in a substantial gainful activity[,] (2) that her disability is severe, and (3) that her impairment meets or equals one of the specific impairments described in the regulations. If the impairment does not meet or equal one of the specific impairments described in the regulations, the claimant can still establish a prima facie case of disability by proving at step four that in addition to the first two requirements, . . . she is not able to perform any work that she has done in the past. Once the claimant establishes a prima facie case, the burden of proof shifts to the agency at step five to demonstrate that the claimant can perform a significant number of other jobs in the national economy. This step-five determination is made on the basis of four factors: the claimant's residual functional capacity, age, work experience and education.

*Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007) (internal citations and quotations omitted).

[2] RFC is the most a claimant can do despite the limitations caused by her impairments. *See* S.S.R. 96-8p, 1996 WL 374184 (July 2, 1996).

On April 21, 2016, the Appeals Council declined to review the decision. (Tr. 1.) Gilliland filed the complaint underlying this action on June 20, 2016, seeking this Court's review of the ALJ's denial of benefits. (Doc. 1.)

**DISCUSSION**

**I. Standard of Review**

A reviewing federal court need only address the issues raised by the claimant in the appeal from the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). A federal court may set aside a denial of disability benefits only if that denial is either unsupported by substantial evidence or based on legal error. *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Substantial evidence is "more than a scintilla but less than a preponderance." *Id.* (quotation omitted). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Id.* (quotation omitted).

The ALJ is responsible for resolving conflicts in testimony, determining credibility, and resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). "When the evidence before the ALJ is subject to more than one rational interpretation, we must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). This is so because "[t]he [ALJ] and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citations omitted). However, the Court "must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)). Nor may the Court "affirm the ALJ's . . . decision based on evidence that the ALJ did not discuss." *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003).

**II. Analysis**

Gilliland contends that the ALJ (a) erred when he rejected the opinion of treating

physician Dr. Mona Amin; (b) failed to include fully the limitations imposed by consultative examiner Dr. Kenneth Littlefield; (c) erred in denying Gilliland's request to subpoena certain physicians; (d) erred in rejecting the opinion of Counselor Nicole Balles; and (e) improperly discredited Gilliland's symptom testimony. (Doc. 16 at 16-25.)

### A. Dr. Mona Amin

Dr. Amin filled out a fibromyalgia questionnaire regarding Gilliland's impairments. (Tr. 959–62.) In it, Dr. Amin noted that she had treated Gilliland for over two years, seeing her every one to three months in that period. (Tr. 959.) She noted that Gilliland had 14 out of 18 trigger points, muscle spasms, fatigue, and chronic pain, along with several other "fibromyalgia associated symptoms." (Tr. 959–60.) Dr. Amin opined that in an 8 hour workday, Gilliland could sit for 2–3 hours, stand for 2–3 hours, lift and carry less than 10 pounds, would often need to alternate between sitting, standing and walking, and would suffer from certain limitations in use of her limbs and flexibility. (Tr. 960–61.) Dr. Amin further noted that Gilliland suffered from moderately severe medication side effects, including lethargy, dizziness and sedation, and would miss at least six days of work per month because of her condition. (Tr. 961–62.)

The ALJ gave Dr. Amin's opinion "little weight"

> because the doctor did not document significant medical abnormalities that support her assessment of the claimant's functional limitations. Aside from the presence of positive trigger points, the other findings do not justify the highly restrictive limitations the doctor assessed. Dr. Amin's opinion is brief, conclusory, and not supported by her own diagnostic and clinical findings. It is not supported by the claimant's routine and conservative course of treatment for fibromyalgia nor by the claimant's activities of daily living, as indicated throughout the record. Dr. Amin listed the claimant's diagnosis and subjective complaints, but did not offer an explanation of the evidence she relied on in forming her opinion. She apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported.

(Tr. 27.)

The opinion of a treating physician is given more weight than those of non-treating and non-examining physicians. *See* 20 C.F.R. § 404.1527; *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). If a treating physician's opinion is uncontradicted, an ALJ must provide "clear and convincing" reasons, supported by substantial evidence, to reject it. *Ghanim v. Colvin*, 763 F.3d 1154, 1160–61 (9th Cir. 2014). If a treating physician's opinion is contradicted, an ALJ must provide "specific and legitimate" reasons, supported by substantial evidence, to reject it. *Id.*

Dr. Amin's opinion as to Gilliland's functional limitations was contradicted by the state agency physicians, who opined initially that Gilliland could occasionally lift 50 pounds, frequently lift 25 pounds, and stand, walk and sit for six hours in an eight hour work day, and that she had no manipulative limitations, (Tr. 94), and opined to the same limitations on reconsideration with the exception for Gilliland's occasional lifting capability (20 pounds) and her frequent lifting capability (10 pounds). (Tr. 111–12.) Accordingly, the ALJ needed to provide specific and legitimate reasons, supported by substantial evidence, to reject Dr. Amin's opinion.

The ALJ did so. Lack of support from the medical records is a legitimate reason to reject the opinion of a treating physician. *See Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("The ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."). And here, there is substantial evidence in the record by which the ALJ could conclude that Dr. Amin's treating records did not support the restrictions to which she opined. In November of 2013, Dr. Amin noted that Gilliland suffered from fatigue and generalized pain, and that her symptoms had been worsening, but that she had no difficulties moving her hands, wrists, elbows, shoulders, although she showed "abnormal" knee motion. (Tr. 838–42.) Gilliland received "some relief" from her symptoms through Flexeril and trigger point injections. (Tr. 841.) The records of visits from December of 2013 and January and February of 2014 show essentially identical

levels of symptoms as the November 2013 visit. (Tr. 820–37.) There are no suggestions of any specific functional limitations. The records of Dr. Kalya, a colleague of Dr. Amin's reflect much the same impressions from March 2012 through June 2013. (Tr. 442–83, 636–54.) The ALJ could reasonably have interpreted these records as not supporting the limitations to which Dr. Amin opined, and where the ALJ's interpretation of the record is reasonable, this court "must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198.[3]

Relatedly, the ALJ noted that Dr. Amin appeared to have relied uncritically on Gilliland's own subjective reports. This is a reasonable interpretation of the record, given that the medical records reflect little objective medical evidence of impairment. And where the claimant's reports are properly discredited, it is legitimate for the ALJ to discount medical opinions based on the claimant's reports. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999) ("A physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded where those complaints have been properly discounted."). As discussed in detail below, the ALJ did not err in discounting some of Gilliland's subjective complaints.

An ALJ may discount a physician's opinion to the extent it conflicts with the claimant's daily activities, *Morgan*, 169 F.3d at 601–02, and the ALJ here asserted this reason in discounting Dr. Amin's opinion. However, the ALJ's decision is not supported by substantial evidence. The ALJ gave a lengthy recitation of Gilliland's daily activities that he found inconsistent with her alleged symptoms. (Tr. 22.) This recitation came in his discussion of Gilliland's credibility, and whether Gilliland's daily activities sufficiently discredit Gilliland's symptom testimony will be discussed below. They do not, however, discredit Dr. Amin's limitations, which dealt specifically with Gilliland's

---

[3] Gilliland argues that the ALJ improperly discounted the *diagnosis* of fibromyalgia because there was no evidence beyond trigger points. (Doc. 16 at 17.) This misreads the ALJ's opinion, which discussed whether the trigger points served as evidence for Dr. Amin's assessed limitations, not the underlying diagnosis of fibromyalgia. (Tr. 27.)

ability to lift, carry, sit, walk and stand. Activities such as using the computer, playing games on the phone, paying bills, performing personal hygiene, and visiting family are not precluded by the physical limitations to which Dr. Amin opined. The ALJ noted that Gilliland occasionally takes trips to the movie theater and drove once to Prescott and once to New Mexico. These activities generally require staying in one position for longer than 20 minutes, which Dr. Amin stated Gilliland was incapable of doing, (Tr. 961), but Gilliland testified that she gets up and moves around when she watches movies, (Tr. 71), and that she had to take numerous breaks during the driving trips, (Tr. 72). At any rate, that Gilliland took 13 hours to drive to New Mexico in the aftermath of her grandmother's death, stopping frequently, is not substantial evidence to question Dr. Amin's limitation as to full-time work.

Likewise, although conservative treatment is generally a sufficient reason to reject a treating physician's opinion of work-preclusive limitations, *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001), in the fibromyalgia context, it is less probative. Gilliland took medication, and there is not necessarily a more aggressive and effective treatment for fibromyalgia beyond medication. At the very least, here, "the record does not reflect that more aggressive treatment options [were] appropriate or available" and it would be illogical to discredit Dr. Amin's opinion "for failing to pursue non-conservative treatment options where none exist." *See Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010).

To the extent that the ALJ erred in discrediting Dr. Amin's opinion based on Gilliland's daily activities and conservative treatment, however, such error was harmless. In assessing whether an error was harmless, a court asks "not whether the ALJ would have made a different decision absent any error [but] whether the ALJ's decision remains legally valid, despite such error." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). For Ms. Gilliland's case, the ALJ cited two specific and legitimate reasons, supported by substantial evidence, to reject the opinion of Dr. Amin. These suffice to uphold the ALJ's decision as to Dr. Amin, regardless of his error in

citing additional reasons that were not supported by substantial evidence. Accordingly, the ALJ did not commit reversible error in rejecting Dr. Amin's opinion.

**B. Dr. Kenneth Littlefield**

Dr. Littlefield prepared a psychological report on Gilliland. (Tr. 621–27.) As relevant to this appeal, Dr. Littlefield opined as to the following on Gilliland's ability to interact with others:

> The claimant can make simple decisions, work in coordination with others, and sustain an ordinary routine. . . . The claimant demonstrated good ability to relate to and interact with others in an appropriate manner based on the interactions by the claimant with this evaluator during the evaluation process. The claimant was polite, cooperative, and pleasant to work with. It is likely the claimant would be able to demonstrate these same characteristics in a work setting, although her mood lability and traits of BPD may cause her to have difficulties in long term relationships. The claimant can interact appropriately with the general public, ask simple questions, and maintain appropriate hygiene. However she may [have] difficulties getting along with coworkers. The claimant may have difficulty responding to supervisory criticism secondary to mood lability and personality disorder traits.

(Tr. 625.)

The ALJ gave this opinion "some weight" and found that the "limitations Dr. Littlefield assessed regarding the claimant likely having trouble getting along with coworkers and responding to supervisory criticism are reasonable and consistent with the claimant's clinical presentation and mental health history." (Tr. 28.) In the RFC, the ALJ limited Gilliland to "occasional interaction with coworkers and supervisors." (Tr. 20.)

Gilliland argues that the RFC fails to capture the essence of the limitations to which Dr. Littlefield opined. The ALJ's interpretation, however, is reasonable. Dr. Littlefield opined that Gilliland would "likely" be "polite, cooperative, and easy to work with" in a work setting, although she "may have difficulty responding to supervisory criticism." A possible difficulty is not the same as a total inability, and the ALJ's incorporation of Dr. Littlefield's opinion into the RFC was reasonable.

Gilliland further argues that the ALJ should have at least permitted further development of the record to determine whether Gilliland might never be able to respond to supervisory criticism, based on her request to subpoena the state's examining and consulting physicians. That objection will be addressed in the next section.

### C. Subpoena and Interrogatories Directed to Dr. Littlefield and Other Physicians

Gilliland filed an "Objection to Records, Subpoena Request, and Interrogatory Request" prior to her hearing before the ALJ:

> We object to the admission of State agency and the Social Security Administration non-examining and examining consulting physician opinions that appear in the record and ask that, if they be admitted, a subpoena be issued to compel the author's attendance at a deposition or hearing.
>
> [. . .]
>
> As a means to obtain necessary data to assist in the weighing of medical opinion evidence, we have enclosed interrogatories and request completion by the medical consultants who rendered opinions herein. The response to interrogatories is to be used in conjunction with the requested subpoena. However, even if no subpoena is issued, response to interrogatories is appropriate and will assist in weighing medical opinion as required by 20 C.F.R. § 404.1527.

(Tr. 288–93.)

The ALJ overruled the objection and denied Gilliland's request. (Tr. 29–30.) Gilliland asserts that the ALJ erred in giving significant weight to the State agency medical reviewers' opinions, and in interpreting Dr. Littlefield's opinion as he did, when Gilliland was entitled to the requested subpoena.

There is, however, no absolute right to subpoena witnesses in a disability hearing. "A claimant in a disability hearing is not entitled to unlimited cross-examination, but is entitled to such cross-examination as may be required for a full and true disclosure of the facts. The ALJ has discretion to decide when cross-examination is warranted." *Copeland v. Bowen*, 861 F.2d 536, 539 (9th Cir. 1988) (internal citation omitted). The Supreme Court in *Richardson v. Perales*, 402 U.S. 389 (1971), noted the general lack of need for live testimony from physicians in disability hearings. For one, "[t]he vast

workings of the social security administrative system make for reliability and impartiality in the consultant reports" as "the agency operates essentially . . . as an adjudicator and not as an advocate or adversary." *Id.* at 403. On the other hand, "the cost of providing live medical testimony at these hearings . . . would be a substantial drain on the trust fund and on the energy of physicians already in short supply." *Id.* at 406; *see also Calvin v. Chater*, 73 F.3d 87, 92–93 (6th Cir. 1996) (holding that there is no absolute right to the issuance of a subpoena absent some "showing of an actual need for cross-examination.").

Gilliland's subpoena request did not demonstrate any such actual need. In fact, it was directed at all state physicians generally but none specifically by name and it cites generalized concerns about the review process in general:

> The basis for such subpoena is that it has come to our attention that the consultants retained by the State agency (examining and non-examining) often lack the specialty pertinent to the impairment suffered by the claimant whose file is being reviewed, will sometimes have a non-medical reviewer's findings copied or incorporated into the RFC assessment, and will rarely, if ever, review a substantial number of treating source records. In fact, we have been told that the reviewers will frequently offer an opinion based on a record review that contains less than five treatment notes. If an examination is performed, the consultants often spend less than 15-20 minutes examining the claimant.

(Tr. 289). Such generalized concerns could apply to *any* social security hearing. The ALJ did not err when denying the subpoena request. Case law makes clear that subpoenas need only be issued upon the showing of an actual, specific need.

### D. Counselor Nicole Balles

Licensed Professional Counselor Nicole Balles filled out a questionnaire relating to Gilliland's mental ability to perform work-related activities. (Tr. 963–64.) She identified a number of mild to moderately severe restrictions on Gilliland's abilities, and opined that Gilliland's psychiatric symptoms would affect the sustainability of Gilliland's work pace. (*Id.*)

The ALJ gave this opinion "little weight" because

> Ms. Balles did not provide medically acceptable clinical or diagnostic findings to support the functional assessment. She

- 10 -

> did not cite the evidence on which she relied to make her assessment. Her opinion is brief, vague, conclusory, and inconsistent with the treatment records showing psychological improvement with consistent therapy, medi[c]ation compliance, and generally stable mental status examinations. Moreover, as an opinion that is not from an acceptable medical source, it is not entitled to be given the same weight as a qualifying medical source opinion (20 CFR 404.1513(a) and (3)).

(Tr. 28.)

The parties do not dispute that Ms. Balles is an "other source" under 20 C.F.R. § 404.1513. (Doc. 16 at 22, Doc. 18 at 15.) An ALJ "may discount testimony from . . . other sources if the ALJ gives reasons germane to each witness for doing so." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

As discussed above, an ALJ may discount even the opinion of a *treating physician* if it is "brief, conclusory, and inadequately supported by clinical findings." *See Thomas*, 278 F.3d at 957. Ms. Balles's notes, from February and March of 2014, may reasonably be read as not supporting the limitations to which she opined. On March 5, Gilliland was grieving the loss of a close friend and was "numb to her emotions" but was working with others to put together a fundraiser. (Tr. 900.) Her affect was appropriate, her mood euthymic, and her interpersonal functions were described as "interactive." (*Id.*) Two weeks later, Gilliland had engaged in no recent "self harm or impulsive behaviors" and was "handling frustration well currently." (Tr. 897–98.)

The ALJ also noted that Ms. Balles's opinion was inconsistent with other portions of the record. This is a germane reason to discount the opinion of an "other" source. *See, e.g.*, *Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (upholding ALJ's rejection of lay testimony as inconsistent with the record as a whole). The ALJ conducted a thorough review of the record, noting difficulties and improvements in Gilliland's mental status. (Tr. 25–26.) Although the record is capable of multiple interpretations, the ALJ reasonably interpreted it to mean that Gilliland was generally stable in response to treatment and medication. Of note, Clonazepam was effective in reducing her anxiety in the midst of family difficulties in February 2012. (Tr. 410.) Gilliland "responded well"

to progressive relaxation and positive thinking interventions in March 2012, (Tr. 751), and she subsequently reported that she had "learned to hold herself together even when she is feeling stressed to her limit," (Tr. 748). In April 2014 she was "doing okay," and reported that Xanax helped mitigate panic attacks and dialectical behavior therapy had been helpful. (Tr. 634.) The ALJ's interpretation of the record as contradicting Ms. Balles's opinion of work-preclusive mental symptoms is not the only possible interpretation, but it is reasonable, and the Court must defer to the ALJ's judgment.

Accordingly, the ALJ did not err in giving Ms. Balles's opinion little weight based on the germane reasons he provided.

### E. Gilliland's Symptom Testimony

The ALJ found Gilliland's symptom testimony to be only partially credible. He found (1) that the "allegations of debilitating pain, anxiety, depression, and overall incapacity are inconsistent with the objective medical evidence"; (2) that although Gilliland's "activities of daily living were somewhat limited, some of the physical and mental abilities and social interactions required in order to perform the activities she has reported are the same as those necessary for obtaining and maintaining employment and are inconsistent with the presence of an incapacitating or debilitating condition" and Gilliland was "capable of a variety of normal activities of daily living and that some of the limited range of activities is due to lifestyle or familial choices and not a result of an established medical impairment"; and (3) some of the reasons Gilliland was unable to find work seemed unrelated to her alleged disability. (Tr. 22–23.) Because the ALJ did not state that he found any evidence of malingering, his reasons for rejecting Hernandez's symptom testimony must be clear and convincing. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007).

Gilliland only challenges, in her opening brief, the ALJ's determination as to her daily activities. Activities that are "transferable to a work setting" may be used to discredit a claimant's allegations of work-preclusive symptoms. *Morgan*, 169 F.3d at 600. The ALJ cited to numerous activities that could be transferred to a work setting.

- 12 -

But an ALJ must also consider the pace at which, and the environment in which, work-transferable activities are completed. *See, e.g.*, *Smolen v. Chater*, 80 F.3d 1273, 1284 n.7 (9th Cir. 1996) ("[M]any home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."); *see also Morgan*, 169 F.3d at 600 ("If a claimant is able to spend a *substantial part of his day* engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations." (emphasis added)).

The ALJ drew his list of Gilliland's daily activities primarily from Gilliland's testimony, as well as several medical records. (Tr. 22.) His summary omits important details about the pace and extent to which Gilliland engaged in work transferable activities. For example, the ALJ noted that Gilliland "uses the computer on a daily basis for things such as email and FaceTime" but did not add the qualification that Gilliland only used the computer for "maybe 30 to 45 minutes max a day." (Tr. 53.) The ALJ wrote that Gilliland "cares for four dogs" but did not specify that she does not walk them or pick up after them, but merely ensures that they have food and water when her husband is not in town. (Tr. 59.) The ALJ noted that Gilliland "indicated that she could care for herself independently when [her husband] is away," but did not address Gilliland's specific testimony, which spoke of simple tasks punctuated by long rest breaks. (Tr. 62–63.)

The ALJ also cited Gilliland's volunteer activities: specifically, her solicitation of donations for Hands Across Anthem, for the fallen Granite Mountain Hotshots, and for a police officer friend who had been killed in the line of duty. However, it appears that Gilliland only spent around an hour on each fundraiser, and her work consisted of making phone calls from home.[4] (Tr. 47–48.) This is not indicative of an ability to work full-

---

[4] The ALJ wrote that the medical records suggested that Gilliland was more heavily involved in the fundraisers than she had testified to. The ALJ based this on a note in the record indicating that Gilliland "has become involved with a few fundraising endeavors." (Tr. 988.) This general observation is not a clear and convincing reason to call into question Gilliland's testimony as to the extent of her involvement.

- 13 -

time outside of the house.

The Court finds, therefore, that the ALJ did not provide clear and convincing reasons to find that Gilliland's daily activities were inconsistent with her testimony of disabling symptoms. But the ALJ also raised two other reasons why he gave only partial weight to Gilliland's symptom testimony.

Gilliland did not specifically challenge the ALJ's other asserted reasons for discrediting Gilliland's testimony. Nevertheless, as she challenged the ALJ's credibility analysis generally, the Court will address the sufficiency of the ALJ's other asserted reasons rather than deeming any objections waived.

The ALJ noted that while Gilliland stopped working in June 2011, it was hardly clear that this was because of her allegedly disabling symptoms. Gilliland testified that she stopped working partially because of emergency gallbladder surgery, partially because of some changes in her psychiatric medications, and partially because the doctor for whom she worked "decided that he wanted to try to do the billing on his own so it was a mutual split." (Tr. 51.) That a claimant separated from employment for reasons other than the alleged disability is a valid reason to discredit the claimant's testimony. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). Even though two of the reasons Gilliland listed are related to her medical impairments, both appear to be temporary and transient rather than indicative of ongoing disability. This interpretation is bolstered by the fact that, as the ALJ noted, Gilliland continued to apply for work for two years after leaving her prior job.

Further, the ALJ noted that Gilliland's testimony of disabling limitations was inconsistent with the medical record as a whole. While an ALJ may not require that the record *corroborate* a claimant's subjective complaints, an ALJ may permissibly use *contradictions* with the objective medical evidence as part of the credibility analysis. *See Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The notes of Dr. Jack Hawks, Gilliland's primary doctor, span several years and often contradict Gilliland's symptom testimony. Dr. Hawks's notes indicate that on

August 30, 2011, after the date of alleged disability onset, Gilliland was recovering from surgery and suffering from chest pains and a cough, but that her mood was good and she denied any other signs or symptoms. (Tr. 396.) Gilliland "ambulate[d] to the examination room without assistance" and was "able to sit comfortably on the examination table without difficulty or evidence of pain." (Tr. 397.) A month later, she sprained her wrist while "lifting and moving several boxes." (Tr. 385.) Dr. Hawks noted a recent diagnosis of fibromyalgia in April of 2012, but wrote that Gilliland had improved with medication and was "overall doing well." (Tr. 364.) Gilliland's pain and anxiety were both "well-controlled" in June of 2012. (Tr. 357.) In November of 2012, her anxiety was "better on her current medications" and she was "doing well" with no acute complaints besides a cough. (Tr. 339.) In March of 2013, Gilliland's fibromyalgia pain was "well-controlled" and apart from urinary symptoms she was "otherwise healthy, with no other acute issues." (Tr. 667.) Gilliland's pain remained "reasonably controlled most of the time" in June of 2013. The same was true in September, (Tr. 874), and December, (Tr. 862), of 2013, and January of 2014, (Tr. 856.)

Thus, substantial evidence, recorded over several years by one of Gilliland's treating physicians, contradicts Gilliland's assertions of disabling physical and mental symptoms.

The ALJ provided two clear and convincing reasons for discrediting Gilliland's symptom testimony. Accordingly, his error in discrediting Gilliland based on her daily activities is harmless. *See Carmickle*, 533 F.3d at 1162.

## CONCLUSION

The ALJ did not commit reversible error in denying Gilliland's application for benefits, and the decision is affirmed.

///

///

///

///

1     **IT IS THEREFORE ORDERED** that the ALJ's decision is **AFFIRMED**. The Clerk of Court is directed to terminate this case and enter judgment accordingly.

Dated this 4th day of October, 2017.

_____
Honorable G. Murray Snow
United States District Judge